# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, | Case No. |
| Plaintiff, | |
| v. | |
| SPECIAL MEMORIES ZOO, LLC; GENE WHEELER INDIVIDUALLY AND DBA SPECIAL MEMORIES ZOO; DONA WHEELER; AND GRETCHEN CROWE, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

Plaintiff Animal Legal Defense Fund ("ALDF"), by and through its undersigned counsel, respectfully files the following Complaint and states as follows:

## <u>NATURE OF THE ACTION</u>

1.      This case is about the mistreatment and inadequate conditions of captivity of numerous animals at an unaccredited animal exhibition facility called Special Memories Zoo. These include both endangered or threatened species, like ring-tailed lemurs, red-ruffed lemurs, gray wolves, tigers, lions, a black leopard, Canada lynx, and Japanese or snow macaques, as well as hundreds of non-endangered animals, such as bears, baboons, monkeys, a giraffe, and numerous birds.

2.      Special Memories Zoo is owned and operated by Defendants Gene Wheeler, Dona Wheeler, and their Zoo Manager Gretchen Crowe, as well as an affiliated limited liability company named Special Memories Zoo, LLC (hereinafter collectively referred to as "Special Memories Zoo" or the "Zoo").

3.      At Special Memories Zoo, members of the species referenced above and scores of other animals live in squalid conditions that fail to meet each animal's basic, species-specific needs. As detailed below and in ALDF's statutory notice of intent to sue letters—which are attached hereto and expressly incorporated herein—animals are housed throughout the facility in cramped enclosures that provide inadequate shelter from the elements, lack fresh water and suitable food, and force the animals held captive inside to live in complete or near-complete social isolation, without opportunities for physical enrichment.[1] Photographic evidence, visitor observations, former employee testimonials, and expert analysis indicate that the animals kept by Special Memories Zoo are experiencing both physical and psychological suffering as a direct result of the deprived conditions imposed on them by Special Memories Zoo.

4.      By inflicting needless pain and suffering on the wide variety of endangered species and other animals kept at its facility, Special Memories Zoo violated the federal Endangered Species Act, 16 U.S.C. §§ 1531-1544 ("ESA"), and State of Wisconsin captive wild animal welfare regulations and animal cruelty statutes. Furthermore, through its repeated violation of federal and state animal and wildlife protection laws on its premises, Special Memories Zoo creates a nuisance that is contrary and repugnant to the interests of the public. Accordingly, ALDF brings this action on behalf of its members, as well as the public at large, to ask the Court to enjoin Special Memories Zoo's unlawful conduct.

---

[1] "Enrichment" is a term used by animal behaviorists and veterinarians to refer to measures intended to give captive animals the opportunity to engage in their natural behaviors, such as searching for food or exploring new objects. Enrichment is essential to the physical, emotional, and psychological well-being of captive wild animals.

## PARTIES

5.      **Plaintiff Animal Legal Defense Fund ("ALDF")** is a national non-profit organization headquartered in Cotati, California with over 200,000 members and supporters nationwide. ALDF pursues its mission of protecting the lives and advancing the interests of animals by persistently advocating for the protection of animals used and sold in commercial enterprises. ALDF frequently focuses on animal husbandry practices and the confinement of animals used for entertainment and exhibition purposes.

6.      At least one ALDF member visited Special Memories Zoo, where she observed and developed aesthetic and emotional connections to the animals at Special Memories Zoo, including the ring-tailed lemurs, red-ruffed lemurs, gray wolves, tigers, lions, a black leopard, Canadian lynx, and Japanese or snow macaques, as well as many non-endangered or threatened animals, including bears, baboons, monkeys, a giraffe, numerous birds, and many other species. She became distressed and upset due to the animal mistreatment and suffering that they witnessed. Members of the public expressed similar concerns about the poor conditions at Special Memories Zoo.

7.      ALDF brings this action on behalf of its members, as well as the public at large. The interests of ALDF members in observing and otherwise enjoying animals at Special Memories Zoo have been, and will continue to be, harmed by the mistreatment of animals by the operation and management of Special Memories Zoo. Additionally, the ongoing conditions and mistreatment of animals at Special Memories Zoo is a nuisance repugnant to the interests of the Wisconsin public at large. The relief sought in this lawsuit—including, but not limited to, the transfer of animals to a bona fide sanctuary—will redress ALDF and its members' ongoing harms caused by the unlawful activities of Special Memories Zoo.

8.     **Defendant Special Memories Zoo, LLC** is a Wisconsin limited liability

company whose registered agent is Dona Wheeler at a registered office of W7013 Spring Road,

Greenville, Wisconsin 54942-9704. Upon information and belief, Special Memories Zoo, LLC

is an entity through which Gene and Dona Wheeler conduct some or all of their operations at

Special Memories Zoo.

9.     **Defendants Gene Wheeler and Dona Wheeler** are individuals who operate a so-

called "zoo" called Special Memories Zoo at W7013 Spring Road, Greenville, Wisconsin

54942. *See* http://www.specialmemorieszoo.info/. Upon information and belief, Gene and Dona

Wheeler reside in Hortonville, Wisconsin on real estate that is also a secondary licensed site

under the Animal Welfare Act and is commonly referred to by Special Memories Zoo staff as

the "Farm" as more fully discussed below.

10.    **Defendant Gretchen Crowe** is an individual who upon information and belief

operates as the Zoo Manager with primary day-to-day authority and control over the operations

of Special Memories Zoo and the Farm. Upon information and belief, Ms. Crowe resides with

the Wheelers at their Hortonville, Wisconsin home.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over this action under 28 U.S.C. § 1331 because ALDF

alleges violations of federal law.

12.    Pursuant to the ESA, 28 U.S.C. §§ 2201-2202, the Court is authorized to provide

declaratory and injunctive relief. The ESA's citizen suit provision further authorizes the Court

to enjoin violations of the ESA and its implementing regulations. 16 U.S.C. § 1540.

13.    ALDF provided notice to Special Memories Zoo of its intent to sue regarding all

animals on September 10, 2019, more than sixty days in advance of this Complaint as required

by the ESA. *See* 16 U.S.C. § 1540(g)(2)(A); **Exhibit A** (September 10, 2019 notice of intent to sue letter). On October 1, 2019, ALDF provided Special Memories Zoo with further notice of its intent to assert ESA claims based on unlawful purchases or transactions involving endangered animals in interstate commerce, including specifically two tigers, and potentially other animals. *See* **Exhibit B** (October 1, 2019 notice of intent to sue letter). The content of both letters is expressly incorporated herein.

14.     Upon information and belief, Special Memories Zoo neither applied for nor received any permit to lawfully "take" any federally listed species, nor has it remedied the violations set out in the notice of intent to sue letters.

15.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b), because Special Memories Zoo resides in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district. ALDF may bring suit in this district because, under the ESA, venue is proper in the district where a violation occurs. 16 U.S.C. § 1540(g)(3)(A).

16.     This Court has supplemental jurisdiction over the Wisconsin state law claims under 28 U.S.C. § 1367(a) because this Court has original jurisdiction under 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g), and the state law claims are so related to the underlying federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

## FACTS

17.     Special Memories Zoo is an unaccredited animal exhibition facility located in Greenville, Wisconsin with a secondary location in Hortonville, Wisconsin. In its makeshift "zoo" in Greenville, Special Memories Zoo confines and exhibits many species of wildlife, including endangered species, which it displays to the public for a fee. Special Memories Zoo

also houses many species, particularly during the offseason, at its secondary "Farm" facility in Hortonville, Wisconsin. The conditions and treatment of individuals at the Farm facility are, upon information and belief, similarly inadequate to, if not more inadequate than, at the primary Greenville location.

18.     Photographic evidence, visitor observations, and other evidence demonstrate that the *hundreds* of animals kept at Special Memories Zoo are housed in cramped and filthy enclosures that provide inadequate shelter from the elements, lack fresh water and suitable food, and force many of the animals held captive inside to live in complete or near-complete social isolation and under other unsuitable conditions.

19.     The conditions of confinement, husbandry, veterinary care, and exhibition activities observed at Special Memories Zoo "injure," "harm," and "harass" many animals at Special Memories Zoo, as those terms are defined by the ESA. These activities are not consistent with generally accepted practices and are likely to inflict ongoing suffering and injury to these animals.

### Ring-Tailed and Red-Ruffed Lemurs

20.     The Zoo possesses and displays ring-tailed lemurs (*Lemur catta*) and red-ruffed lemurs (*Varecia rubra*) in conditions that cause them to suffer psychologically and physically and amount to an unlawful "take" in violation of the ESA. The United States Fish and Wildlife Service ("FWS") lists all members of the family *Lemuridae*, including ring-tailed lemurs and red-ruffed lemurs, as endangered, wherever found. 50 C.F.R. § 17.11; 35 Fed. Reg. 8491, 8495 (June 2, 1970); 41 Fed. Reg. 26,019 (Jun. 24, 1976). An individual who "takes" a ring-tailed lemur or red-ruffed lemur violates the ESA's Section 9 and is subject to civil and criminal penalties. 16 U.S.C. § 1540(a)–(b).

21.     Lemurs are found in the wild in portions of Madagascar. They travel widely in search for food and roam within territories that range from several acres to over a hundred acres. Lemurs are highly social animals with advanced cognitive abilities. Ring-tailed lemurs typically live in social groups ranging from 8 to 20 individuals and red-ruffed lemurs in groups ranging from 2 to 30 individuals. Depriving lemurs of appropriate socialization causes the animals to suffer.

22.     The Zoo harms and harasses its lemurs. The lemurs' housing is extremely cramped and filthy, with improper and insufficient provisions of food, water, and psychological enrichment objects. The primate enclosure at the Farm, in particular, does not have windows and the animals frequently rock their cages, sit depressed in the corners, pace in circles, or behave aggressively—all signs of immense stress. According to reports, one elderly lemur, after enduring recurring attacks, huddled in a corner with his head down for nearly a week until he died or was euthanized. The carcass of a second, newborn lemur was found in an adjacent capuchin cage where a male capuchin was tossing it around.

23.     Confinement of lemurs under these conditions constitutes an unlawful "take" within the meaning of the ESA because the conditions "significantly disrupt [their] normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering," resulting in prohibited "harassment." 50 C.F.R. § 17.3. Confinement also injures these individuals physically and psychologically and therefore constitutes prohibited "harm" under the ESA. *Id.*

24.     Upon information and belief, the Zoo neither applied for nor received any permit to lawfully "take" a ring-tailed or red-ruffed lemur.

25.     The physical and psychological harm and harassment to these individuals caused by the Zoo will only exacerbate over time if not remedied by their prompt relocation to a proper sanctuary and integration into a lemur troop.

### Gray Wolves

26.     The Zoo possesses and displays gray wolves in conditions that amount to an unlawful "take" under the ESA.

27.     The gray wolf is listed as endangered under the ESA throughout Wisconsin. 50 C.F.R. § 17.11; 43 Fed. Reg. 9607 (March 9, 1978) (listing gray wolves).  An individual who "takes" a gray wolf violates the ESA's Section 9 and is subject to civil and criminal penalties. 16 U.S.C. § 1540(a)–(b).

28.     The FWS describes the gray wolf, *Canis lupus*, as "an integral component of the ecosystems to which it typically belongs."[2]

29.     Species with large territories, like gray wolves, are particularly vulnerable to stress in captivity. In the wild, wolf territories are typically between 200 and 500 square miles and may be as large as 1,000 square miles. Wolves spend about 35% of their time in transit, often traveling 20 to 30 miles per day, but covering over 100 miles a day when prey is scarce. The species requires large, environmentally complex spaces that allow the packs to express a wide range of natural movements and behaviors, from choosing den sites to hunting to avoiding competition and confrontation.

---

[2] *See Species Profile for Gray wolf (Canis lupus)*, U.S. FISH & WILDLIFE SERVICE, https://ecos.fws.gov/ecp0/profile/speciesProfile?spcode=A00D.

30.     Wolves are highly social animals that live in packs in their natural environment. Gray wolves live, travel, and hunt as part of this pack community, which is typically comprised of four to seven individuals.

31.     The habitat and conditions at the Zoo are not conducive to these natural behaviors and therefore amount to harm and harassment of gray wolves housed at the Zoo.

32.     For wolves in captivity, choice and control are the two most significant criteria for ensuring their welfare. To meet these needs, wolf enclosures must be large enough to allow a choice among different regions, to allow them to be visually separated from visitors, and to give them control over their activities. One particularly important aspect of choice and control for wolves is the ability to retreat from view.

33.     At the Zoo, not only is the wolf enclosure small and lacking variety, the wolves often do not have access to clean water. It is also insufficient for other species-specific reasons. The impacts of the inhumane living conditions are palpable: people observed the wolves fighting and one wolf whimpering. This is the exact kind of suffering the ESA's take provision aims to prevent.

34.     The confinement of wolves in these conditions "significantly disrupt[s] normal behavioral patterns" and therefore constitutes "harassment" under the ESA. 50 C.F.R. § 17.3. The wolves' confinement also injures them physically and psychologically and therefore constitutes "harm" under the ESA, as is acutely demonstrated by the recent observation of a wolf in an emaciated and lethargic state. *Id.* As a result, this constitutes a "take" under the ESA.

35.     Upon information and belief, the Zoo neither applied for nor received any permit to lawfully "take" a gray wolf.

36.     The physical and psychological harm caused by the Zoo's "harassment" and "harm" of these wolves will only exacerbate over time if not remedied by their prompt relocation to a proper sanctuary and integration into a wolf pack.

**Tigers**

37.     The Zoo possesses and displays tigers in conditions that amount to an unlawful "take" under the ESA.

38.     Tigers (*Panthera tigris*) are endangered wherever found. 50 C.F.R. § 17.11. An individual who "takes" a tiger violates the ESA's Section 9 and is subject to civil and criminal penalties. 16 U.S.C. § 1540(a)–(b).

39.     Tigers are one of the largest living carnivores and their territories range from 27 to 32 square miles for females and 103 to 114 square miles for males. They are also a long-ranging species, known to travel over 400 miles to reach tiger populations in other areas. As with other long-ranging species with large territories, tigers are particularly vulnerable to stress in captivity, and stereotypical behavior in captive tigers correlates to the size and complexity of the enclosure. A 2014 study of 38 tigers in seven French zoological parks sought to quantify the influence of enclosure size on stereotypical pacing and found a significant negative correlation between the total distance paced and the enclosure size. Therefore, researchers have concluded that both large and enriched naturalistic enclosures are essential to preventing the onset of tigers' stereotypical behaviors.

40.     Tigers are also avid swimmers, keeping cool on hot days by bathing in rivers and lakes and swimming up to 18 miles in a day. A 2017 study monitored 41 tigers at six zoos in India, measuring stereotypical behaviors and stress levels through fecal glucocorticoid metabolites, a biochemical marker of stress. Researchers concluded that large enclosures with a

pool with clean water are essential for tigers—they reduce stress and promote naturalistic behavior. Likewise, the Association of Zoos and Aquariums (AZA) Tiger Care Manual says that all tiger exhibits should include relatively large, complex outdoor space and water pools, moats, and/or running streams, and that the addition of a concrete pool is key in tiger exhibits.

41.     Special Memories Zoo does not provide its tigers with the basic necessities of clean water, food, or straw: the water tanks are full of algae, the food is infested with maggots, and the straw is left soiled and unchanged for up to months on end. In addition, one visitor stated: "There was a tiger in a small cage that paced back and forth the entire time we were there." That pacing is evidence of chronic stress and restlessness. The small cage is an insufficient habitat for a tiger. There is no space for the tigers to swim, run, or even stretch their legs—let alone engage in a normal range of social or stimulating activity.

42.     Confinement of tigers under these conditions constitutes an unlawful "take" within the meaning of the ESA because the conditions "significantly disrupt [their] normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering," resulting in prohibited "harassment." 50 C.F.R. § 17.3. Confinement also injures these individuals physically and psychologically and therefore constitutes prohibited "harm" under the ESA. *Id.*

43.     Upon information and belief, the Zoo neither applied for nor received any permit to lawfully "take" tigers.

44.     The physical and psychological harm and harassment to these individuals caused by the Zoo will only exacerbate over time if not remedied by their prompt relocation to a proper sanctuary.

**Black Leopard**

45.    The Zoo possesses and displays a black leopard in conditions that amount to an unlawful "take" under the ESA.

46.    Black leopards (*panthera pardus*) are listed as endangered wherever found, except in certain portions of Africa where they are protected as threatened. 50 C.F.R. § 17.11; 37 Fed. Reg. 6476 (Mar. 30, 1972); 47 Fed. Reg. 4204 (Jan. 28, 1982). An individual who "takes" a black leopard violates the ESA's Section 9 and is subject to civil and criminal penalties. 16 U.S.C. § 1540(a)–(b).

47.    The leopard is the smallest of the large cats in the genus *Panthera*, though leopards vary in size across their range. Leopards can reach a maximum speed of 60 kilometers per hour, make horizontal leaps of 6 meters, and make vertical leaps of 3 meters.

48.    Leopards have a polygynous mating system. Both sexes are territorial and defend their territories against individuals of the same sex, although there is some overlap. Males have a territory that encompasses the territories of several females. Although generally solitary, males and females will associate for several days during mating before separating again, and females will raise and nurture the resulting cubs for over a year.

49.    Generally, the size of a leopard's home range varies based upon prey availability, with larger home ranges found in locations where prey availability is low. Ranges typically span dozens of square kilometers and often exceed a hundred square kilometers (a distance that would cover more than 15% of Outagamie County, Wisconsin, where the Zoo is located).

50.    Leopards naturally engage in stalking behaviors and prey on a wide range of other species, from beetles and rodents to large antelopes. Females and cubs tend to prey on smaller animals. Leopards attack prey by stalking and pouncing. Leopards can be active at night or

during the day (in Kenya and South Africa, 66% of leopard activity is nocturnal). Importantly, leopards often drag their prey up into trees, making the availability of three-dimensional space critical to an appropriate habitat.

51.     As with the enclosures for the other large, endangered species at the Zoo and Farm, the leopard does not have adequate space or stimulation, including insufficient three-dimensional space. She is unable to engage in natural behaviors, and as a result, she suffers from chronic stress—evidenced by stereotypical behaviors. At an even more fundamental level, the Zoo fails to regularly clean the leopard's water tanks. All of these conditions constitute "harm" under the ESA.

52.     These unnatural conditions constitute a "take" because, as detailed above, they "significantly disrupt [her] normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering," resulting in prohibited "harassment." 50 C.F.R. § 17.3. Her confinement also injures her physically and psychologically and therefore constitutes "harm" under the ESA. *Id.*

53.     Upon information and belief, the Zoo neither applied for nor received any permit to lawfully "take" a black leopard.

54.     The physical and psychological harm and harassment caused by the Zoo will only exacerbate over time if not remedied by the leopard's prompt relocation to a proper sanctuary.

**Lions**

55.     The Zoo possesses and displays endangered lions in conditions that amount to an unlawful "take" under the ESA.

56.     Lions (*Panthera leo leo* and *Panthera leo melanochaita*) are an endangered species. 50 C.F.R. § 17.11. An individual who "takes" a lion violates the ESA's Section 9 and is subject to civil and criminal penalties. 16 U.S.C. § 1540(a)–(b).

57.     When he was Director of the FWS, Dan Ashe described lions as "one of the planet's most beloved species and an irreplaceable part of our shared global heritage."

58.     Lion home ranges vary by location from 8–17 square miles to over 800 square miles. Lions travel up to 8 miles a day. Lions are very social, with females and cubs living in prides averaging 4–6 adult females and up to 8 males with a lifelong alliance to the pride. The AZA manual sets a minimum of 10,000 square feet for lion enclosures. In addition, because lions are accustomed to a warm environment, the AZA manual calls for access to indoor enclosures or a supplemental heat source in temperatures below 50° F, yet Special Memories Zoo fails to provide adequate protections from such temperatures or adequate supplemental heat sources even though it is located in an area of the country that routinely has daily high temperatures well below 50° F during several winter months.

59.     Captive felids, such as lions, have particularly high needs for environmental enrichments. Enrichments can enhance captive animals' well-being by stimulating active behaviors and reducing stereotypical behaviors commonly seen in zoo felids. Because of the complexity of lions' exploring and hunting in the wild, it remains difficult to provide fully for this complex array of behaviors within the captive setting.

60.     Special Memories Zoo fails to provide its lions with even the most minimal environmental enrichments—let alone clean water tanks. Like the other species with large territories, the lions at the Zoo are suffering from deprivation and living in a constant state of stress.

61. Confinement of lions under these conditions constitutes an unlawful "take" within the meaning of the ESA because the conditions "significantly disrupt [their] normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering," resulting in prohibited "harassment." 50 C.F.R. § 17.3. Confinement also injures these individuals physically and psychologically and therefore constitutes prohibited "harm" under the ESA. *Id.*

62. Upon information and belief, the Zoo neither applied for nor received any permit to lawfully "take" lions.

63. The physical and psychological harm and harassment to these individuals caused by the Zoo will only exacerbate over time if not remedied by their prompt relocation to a proper sanctuary.

## Canada Lynx

64. The Zoo possesses and displays Canada lynx in conditions that amount to an unlawful "take" under the ESA.

65. Canada lynx (*Lynx canadensis*) are listed as threatened "wherever found in the contiguous USA." 50 C.F.R. § 17.11. ALDF recognizes that the FWS issued a special 4(d) rule that authorized unpermitted "takes" of captive born Canadian lynx, 50 C.F.R. § 17.40(k), yet this disparate treatment of wild and captive species is invalid as a matter of law because it directly conflicts with the statute's requirements. *See* 63 Fed. Reg. 48634-02 at 48636 (Sept. 11, 1998) (recognizing the statutory term "take" was "defined by Congress in Section 3 of the Act" as applying to "endangered or threatened wildlife, whether wild or captive," and therefore "the statutory term cannot be changed administratively" to exclude captive individuals); *see also Kuehl v. Sellner*, 887 F.3d 845, 852-53 (8th Cir. 2018) (recognizing the ESA applies to captive endangered species in affirming judgment against roadside zoo for violating the ESA).

Therefore, an individual who "takes" a Canada lynx violates the ESA's Section 9 and is subject to civil and criminal penalties. 16 U.S.C. § 1540(a)–(b).

66.     Regardless of the invalid federal split-listing of the Canada lynx, Special Memories Zoo's treatment of the Canada lynx violates Wisconsin's captive wild animal and cruelty statutes, which have specific provisions for lynx, and may also violate Wisconsin's endangered species protections, to which the FWS regulation is inapplicable.

67.     Canada lynx primarily inhabit the northern forests of Canada and Alaska, with smaller populations in the contiguous U.S. Canada lynx typically inhabit regions where snow cover continues for four months or more. Lynx density varies from one lynx per square mile to one lynx per 39 square miles—this depends on the availability of their primary food source, snowshoe hare. Home ranges vary in size and have been recorded from 3 to 302 square miles.

68.     In 2013, researchers performed an exploratory analysis of housing and husbandry factors that may affect stress physiology in captive Canada lynx by measuring the biochemical stress marker fecal glucocorticoid metabolite ("FGM") in 45 captive lynx across 22 institutions. Researchers identified three factors that were "strongly correlated" with stress response: (1) total area of enclosure; (2) sex of cage-mates; and (3) number of hiding locations. During the course of the study, one male was moved to a larger enclosure at the same institution, and FGM concentrations decreased notably following the move. Researchers ultimately concluded that bigger enclosures are likely better for lynx well-being.

69.     The Zoo keeps Canada lynx in tiny, barren, unclean and foul-smelling enclosures with minimal to no snow cover, frustrating their natural behaviors. Confinement of the lynx under these conditions constitutes an unlawful "take" within the meaning of the ESA because the conditions "significantly disrupt [their] normal behavioral patterns which include, but are

not limited to, breeding, feeding, or sheltering," resulting in prohibited "harassment." 50 C.F.R.
§ 17.3. Confinement also injures these individuals physically and psychologically and therefore
constitutes prohibited "harm" under the ESA. *Id.*

70.     The physical and psychological harm and harassment to these individuals caused
by the Zoo will only exacerbate over time if not remedied by their prompt relocation to a proper
sanctuary.

### Japanese Macaque / Snow Macaque

71.     The Zoo possesses and displays Japanese macaques, also known as snow
macaques, in conditions that amount to an unlawful "take" under the ESA.

72.     The FWS lists the Japanese macaque as threatened wherever it is found. 50 C.F.R.
§ 17.11(h); 50 C.F.R. 17.40(c). As discussed with respect to the invalid split-listing of the
Canada Lynx, the similar 4(d) rule regarding captive born Japanese macaques is equally invalid.
50 C.F.R. § 17.40(c). Wild Japanese macaques are subject to Section 9 of the ESA, and the
FWS itself determined that protections must equally apply to captive and wild members of the
same species. 78 Fed. Reg. 33790, 33793 (June 5, 2013).  Therefore, an individual who "takes"
a Japanese macaque violates the ESA's Section 9 and is subject to civil and criminal penalties.
16 U.S.C. § 1540(a)–(b).

73.     Japanese macaques typically live in large groups across broad expanses of forest
land. In a comprehensive study of 117 groups of macaques, the average group size was 40.8
individuals and the smallest extreme was 10 individuals. Macaques form strong social bonds,
especially the females, who often remain in the same troops throughout their lives. Although
male Japanese macaques are much larger than females, the females choose their mates; they
typically will not mate with the same males inside a 4–5 year period. Courtships last no more

than two days on average. Japanese macaques also engage in social activities, whether for survival—such as washing and peeling food together—or for fun, such as rolling snowballs. In captivity, environmental enrichment is vital because it can stimulate both the brain and body, provides novelty, and simulates behaviors found in the wild.

74.    The home range of Japanese macaques averages 1.43 square miles per group. In evergreen broadleaf forests—the habitat in which Japanese macaques have the smallest home range—the smallest estimated home range for an individual is 14,000 square meters (over two and a half football fields). In the largest home range habitat, deciduous broadleaf forest, each individual Japanese macaque can use up to 790,000 square meters—nearly 148 football fields.

75.    Special Memories Zoo's housing of two macaques—Bill and Sheri—subjects these endangered animals to harm and harassment. Whereas the very smallest groups of macaques in the wild consist of ten individuals, Bill and Sheri are housed either together or—currently—in complete isolation. By housing the macaques together, the Zoo subjected Sheri, the female, to having a stronger animal chase and bite her. Sheri was forced to live alone with a male for far longer than any courtship period would last, and far longer than any female macaque would be alone with a male in the wild. Because of the confinement and absence of other females, she had no ability to escape or seek protection from biting. Now, in isolation, Bill and Sheri have no social interactions whatsoever. They have no intellectual stimuli and their enclosures, in addition to being filthy, are far smaller and barer than even the most minimal home ranges that Japanese macaques typically inhabit. The macaques exhibit stereotypical behaviors, such as circling back and forth, rocking their cages, acting aggressively, and sitting depressed in a corner.

76.     Confinement of the macaques under these conditions constitutes an unlawful "take" within the meaning of the ESA because the conditions "significantly disrupt [their] normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering," resulting in prohibited "harassment." 50 C.F.R. § 17.3. Confinement also injures these individuals physically and psychologically and therefore constitutes prohibited "harm" under the ESA. *Id.*

77.     The physical and psychological harm and harassment to these individuals caused by the Zoo will only exacerbate over time if not remedied by their prompt relocation to a proper sanctuary.

**<u>Other Animals</u>**

78.     Special Memories Zoo confines numerous other animals in inhumane and unsanitary conditions that results in mistreatment. Based on recent USDA inventories, Special Memories Zoo possesses and exhibits individuals of the following Animal Welfare Act regulated species, as well as numerous reptiles and birds that are not listed: Barbary Sheep (*Ammotragus lervia*), Blackbuck (*Antilope cervicapra*), Binturong (*Arctictis binguron*), Nilgai (*Boselaphus tragocamelus*), Common Marmoset (*Callithrix jacchus*), Black Tufted-Ear Marmoset (*Callithrix kuhlii*), Dromedary Camel (*Camelus dromedarius*), Domestic Goat (*Capra hircus*), Domestic Guinea Pig (*Cavia porcellus*), Cattle/cow/ox/watusi (*Bos taurus*), White-Headed/White-throated Capuchin (*Cebus Capucinus*), Domesticated Chinchilla (*Chinchilla lanigera*), Vervet (*Chlorocebus pygerythrus*), Hoffmann's Two-toed Sloth (*Choloepus hoffmanni*), Black-Tailed Prairie Dog (*Cynomys ludovicianus*), Burchell's/Grant's/ Chapman's/Plains Zebra (*Equus quagga*), North American Porcupine (*Erethizon dorsatum*), Patas Monkey (*Erythrocebus patas*)*,* Giraffe (*Giraffa camelopardalis*), Alpaca (*Lama pacos*),

Geoffroy's Cat (*Leopardus geoffroyi*), North American River Otter (*Lontra canadensis*),

Northern/Eurasian Lynx (*Lynx lynx*), Bobcat (*Lynx rufus*), Crab-Eating Macaque/Cynomolgus

Monkey (*Macaca fascicularis*), Rhesus Macaque (*Macaca mulatta*), Sulawesi Crested Macaque

(*Macaca nigra*), Groundhog/Woodchuck (*Marmota monax*), Fisher (*Martes pennanti*), Striped

Skunk (*Mephitis mephitis*)*,* White-Nose Cotati (*Nasua narica*), Mountain Cotati (*Nasuella

olivacea*), Domestic Rabbit/European Rabbit (*Oryctolagus cuniculus*), Red Kangaroo

(*Osphranter rufus*), Sheep, including all domestic breeds (*Ovis aries aries*)*,* Hamadryas Baboon

(*Papio hamadryas*), Springhaas (*Pedetes capensis*), Sugar Glider (*Petaurus breviceps*), Raccoon

(*Procyon lotor*), Common Squirrel Monkey (*Saimiri sciureus*), Brown Capuchin/Tufted

Capuchin (*Sapajus apella*), Eastern Grey Squirrel (*Sciurus carolinensis*), Domestic

Pig/Potbelly Pig/Micro Pig (*Sus scrofa domestica*), North American Black Bear (*Ursus

americanus*), Syrian Brown Bear (*Ursus arctos syriacus*)*,* and the Red Fox, which includes the

Silver Fox and Cross Fox (*Vulpes vulpes*).

79. Special Memories Zoo's mistreatment of animals at the facility, along with its

"take" of animals listed as endangered or threatened under the ESA, violates Wisconsin law and

indicates that the facility is unfit to properly care for wild animals.

80. Under Wisconsin law, "[a]ny person, county, city, village or town may maintain

an action to recover damages or to abate a public nuisance from which injuries peculiar to the

complainant are suffered, so far as necessary to protect the complainant's rights and to obtain an

injunction to prevent the same." Wis. Stat. Ann. § 823.01. "A public nuisance is a condition or

activity which substantially or unduly interferes with the use of a public place or with the

activities of an entire community." *Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co*., 646

N.W.2d 777, 788 (Wis. 2002).

81.     Wisconsin has statutory provisions directly addressing "pen specifications, humane handling, care, treatment and transportation of captive wild animals." Wis. Adm. Code §§ NR 16.30(2)(a) (2017) (structure and construction), 16.30(2)(b) (housing facilities with food and bedding), 16.30(2)(c) (surfaces of enclosures), 16.30(2)(f) (pest control), 16.30(3)(a) (space for animals in pens), 16.30(3)(b) (protection from the elements and ventilation), 16.30(7) (species-specific environmental enrichment), 16.30(8) (feeding, watering, and food and water receptacles). In pertinent detail, enclosures must "protect the captive wild animals from injury, contain the animals securely and restrict other animals from entering" and "be free of any accumulation of trash, waste material, refuse, weeds and other discarded materials." *Id.* § NR 16.30(2)

82.     Moreover, the statute specifies that animals must be able to make "normal postural and social adjustments" and states that "inadequate space may be indicated by evidence of malnutrition, poor condition, debility, stress or abnormal behavior patterns." *Id.* § NR 16.30(3)(a). Lastly, persons must offer captive wild animals potable water "not less than twice daily for at least one hour each time" and must feed the animals at least once daily with food that is "uncontaminated, wholesome, palatable and of sufficient quantity and nutritive value to maintain the normal condition and weight of the animal. The diet shall be appropriate for the individual animal's age and condition." *Id.* § NR 16.30(8).

83.     In addition to these standards for all captive wild animals, Wisconsin's statute adds more detailed protections for the following animals at the Zoo and Farm: lynx, raccoons, bears, otter, bobcats, fox and fishers. *Id.* § NR 16.30(4), (7)(b), (9)(c). In pertinent detail, regarding bobcats, lynx, fox and fishers, license holders must "develop, document and follow an appropriate plan for environment enhancement adequate to promote the psychological well-

being of these captive wild animals . . . in accordance with the currently accepted professional standards as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian." *Id.* § NR 16.30(7)(b). Raccoons must have, in addition to other accommodations, pens that are "designed and constructed of suitable materials" and "kept in good repair." *Id.* § NR 16.30(4)(c).

84. Lastly, Wisconsin law addresses the "[e]xhibition of captive wild animals" and these provisions offer even stricter regulations than § NR 16.30, specifically regarding sanitation. *Id.* § NR 16.35. These provisions add that "[e]xcreta and food waste shall be removed from primary enclosures and from under primary enclosures as often as necessary to prevent an excessive accumulation" and "[p]rimary enclosures and food and water receptacles shall be cleaned and sanitized at least once every 2 weeks and more often if necessary." *Id.* § NR 16.35(3).

85. In addition to the provisions addressing captive wild animals, Wisconsin has an animal cruelty statute that applies to "*every* living: (a) Warm-blooded creature, except a human being; (b) Reptile; or (c) Amphibian." Wis. Stat. § 951.01 (emphasis added). Although Wisconsin's cruelty laws cannot controvert its laws regulating captive wild animals, they are applicable and enforceable with respect to these animals. Wis. Stat. § 951.015(1),(2); *see also State v. Kuenzi*, 796 N.W.2d 222, 225 (Wis. App. 2011), review denied, 806 N.W.2d 637 (Wis. 2011) (recognizing that the language of Wisconsin's animal cruelty statute, "on its face," demonstrates the statute's broad application to all animals).

86. Wisconsin's statute defines cruelty as "causing unnecessary and excessive pain or suffering or unjustifiable injury or death." Wis. Stat. § 951.01. It prohibits treating animals in a "cruel manner," *Id.* § 951.02, and details additional requirements with which people in

possession of animals must comply. First, animals must have proper access to food, water, and shelter. *Id.* §§ 951.13 (food and water), 951.14 (shelter). Indoor shelters must be temperature controlled and ventilated while outdoor shelters must provide protection from sunlight and inclement weather. *Id.* § 951.14(1)-(2). All enclosures, both indoor and outdoor, must also abide by sanitation requirements including "periodic cleaning to remove excreta and other waste materials, dirt and trash." *Id.* § 951.14(4). Finally, all enclosures must abide by structural and space requirements. *Id.* § 951.14(3). Structurally, people must maintain the enclosures so they can contain the animals and protect them from injury. *Id.* § 951.14(3)(a). Under the space requirements, animals must have "adequate freedom of movement." *Id.* § 951.14(3)(b). In pertinent part, Section 951.14(3)(b) explains that "[i]nadequate space may be indicated by evidence of debility, stress or abnormal behavior patterns."

87.     Special Memories Zoo's violations of Wisconsin laws include, but are not limited to the following:

88.     Wis. Admin. Code NR § 16.30(3)(a); Wis. Stat. §§ 951.02, 951.14(2),(3)(b): Confining animals to undersized enclosures that do not provide for "normal postural and social adjustments" or even "adequate freedom of movement." Numerous public comments remark on how small the animals' cages are. The Zoo animals' abnormal behaviors demonstrate that these small cages impair the animals' freedom of movement. In addition to the endangered species' abnormal behaviors, detailed above: primates frequently rock their cages, sit depressed in the corners, pace in circles, or behave aggressively; a crane injured his wing so badly by flapping against an undersized cage that blood from the wing splattered across the barn; and parakeets die frequently from living in crowded conditions with other sick birds. These behaviors upset visitors, who commented online, for example, that "all of the animals seemed entirely

miserable" and "the big animals were especially sad." Subjecting animals to such conditions is not only cruel on its face, it directly violates Wisconsin's space provisions.

89.     Wis. Admin. Code § NR 16.30(3); Wis. Stat. §§ 951.02, 951.14(3): There have been multiple reports of animals harming each other while under the care of Special Memories Zoo—specifically, male animals harming smaller females due to unnatural housing arrangements. Under Special Memories Zoo's care: a male macaque named Cooper bit and wounded a female macaque's upper right thigh, and the Zoo failed to separate the animals in a timely manner; a male Japanese macaque named Bill repeatedly harmed a female Japanese macaque named Sheri, and the Zoo failed to separate the animals in a timely manner; a male binturong bit a female binturong above her eye; a male blackbuck brutally injured a female blackbuck, and the Zoo failed to separate the animals—despite a keeper bringing the problem to Ms. Crowe's attention; a male baboon fought with female baboons and the Zoo failed to keep them separated; a male capuchin was found tossing the carcass of a baby lemur; and one wolf constantly picks on a second, who is constantly heard whimpering. Among other concerns these incidents raise, they depict that the animals do not have space for "normal . . . social adjustments."

90.     Wis. Admin. Code § NR 16.30(7): The animals at the Zoo and on the Farm suffer from lack of enrichment. Inadequate enrichment for lynx, bobcats, fox, and fishers is a further violation of subsection b, which mandates specific forms of enhanced enrichment for these species.

91.     Wis. Admin. Code. § NR 16.30(4),(7)(b),(9)(c): These provisions extend special protections to several species at the Zoo— lynx, raccoons, bears, otter, bobcats, fox, and fisher—and the Zoo's enclosures do not meet Wisconsin's specifications. Indeed, one visitor

described the animal homes as "too small cages on a concrete slab" and remarked that there were "[n]o habitat[s] whatsoever."

92.     Wis. Admin. Code §§ NR 16.35(3), 16.30(2); Wis. Stat. § 951.14(4): Special Memories Zoo does not instruct its staff to follow any cleaning schedule whatsoever. The giraffe's cage, for example, went uncleaned for over a month and the tiger den went uncleaned for nearly three months. This directly violates Wisconsin's bi-monthly "periodic cleaning" requirements. Making matters worse, Ms. Crowe not only fails to schedule cleanings as the law requires, but she further denied employees' cleaning requests. Because the law requires cleaning "more often [than every two weeks] if necessary," denying these requests is in itself a violation of Wisconsin law.

93.     Wis. Admin. Code §§ NR 16.35(3), 16.30(2),(3)(b); Wis. Stat. §§ 951.02, 951.14(4): A second violation of Wisconsin's sanitation provision results from the first—Special Memories Zoo fails to "remove excreta and other waste materials, dirt and trash so as to minimize health hazards" and "as often as necessary to prevent an excessive accumulation." According to reports, the lynx and bear cages are "foul smelling" and the giraffe developed a cough from inadequate ventilation. Moreover, observers reported excessive piles of feces in numerous enclosures including those of raccoons, dogs, bobcat kittens, rabbits, otters, and tigers. Most egregiously, the raccoons often cling to the top corner wall of the cage so that they do not have to sit in feces, and a rabbit suffered from "urine scalding," a condition where urine is allowed to soak on a rabbit's body for a significant period of time causing potentially severe skin inflammation and hair loss.

94.     Wis. Admin. Code §§ NR 16.35(3), 16.30(2)(e): A live rat was found in a bucket of meat that is fed to the big cats, wolves, and fishers, directly violating the requirements that food be properly stored and food receptacles be cleaned to prevent vermin infestation.

95.     Wis. Admin. Code §§ NR 16.35(3), 16.30(8); Wis. Stat. §§ 951.13, 951.14(4): Water bowls and tanks for numerous animals at the Zoo and Farm are reportedly filthy because Ms. Crowe discourages workers from bringing water bowls out of the cages to clean them properly with soap and sponges. Filthy water bowls and tanks were reported in enclosures for bobcats, primates, lions, tigers, the leopard, raccoons, wolves, porcupines, camels, and goats. These water bowls and tanks are often coated in algae. A Humane Society of the United States (HSUS) complaint reported that the brown bears' water dish "resembles a watery sludge topped with an oily residue." Such conditions violate both the sanitation and water provisions of Wisconsin law.

96.     Wis. Admin. Code § NR 16.30(8); Wis. Stat. §§ 951.13, 951.14(4): Special Memories Zoo fails to provide many of the animals with enough water. The pig at the Farm often does not have any water at all, and the Zoo received a direct noncompliance from the USDA after failing to adequately water the primates. Upon information and belief, the Zoo has no system for monitoring food, water, and supplements for any animals, and the Zoo Manager rejected employee suggestions to implement such a system. This can result in animals suffering from extreme thirst to the point they attempt to drink from visitors' water bottles.

97.     Wis. Admin. Code § NR 16.30(8); Wis. Stat. § 951.13: Special Memories Zoo fed emus, ostriches, and rheas dog food for over half a month after it ran out of commercially-prepared ratite food. Likewise, bears are only fed dog food in the winter and fruits, bakery items, and breakfast cereal in the summer. Such food is not "appropriate for the individual

26

animal's age and condition" and was insufficient to "maintain animals in good health." Upon information and belief, there are frequently long delays of several days between the time Zoo employees notify the Zoo Manager regarding the exhaustion of food supplies and the time when the Zoo Manager would obtain more food. In addition, felids are often fed old, rancid meat that has been left unrefrigerated. Feeding animals in this way violates Wisconsin's mandate that animals receive "uncontaminated, wholesome, [and] palatable" food.

98.     Wis. Admin. Code § NR 16.30(2); Wis. Stat. § 951.14(3)(a): Numerous escapes at the Zoo and Farm demonstrate that the animals' structures are inadequate. For example, a mother chinchilla and her two babies escaped into the reptile house because the cage door did not close properly. Although she discovered this problem, Ms. Crowe failed to remedy the situation and the chinchillas escaped a second time. In addition, as discussed above, a male capuchin was found tossing the dead body of a newborn lemur. Upon information and belief, bobcats are kept in dog kennels with just tiny clips to prevent their escape, and a tiger once was loose for 15 minutes outside of its habitat at the Zoo. Given these incidents, the Zoo is clearly violating Wisconsin's statutory provision that "housing facilities shall be structurally sound and maintained in good repair to protect the animals from injury and to contain the animals." It is also violating the captive wild animal regulations, which require pens that "contain the animals securely and restrict other animals from entering."

99.     Wis. Stat. §§ 951.02, 951.14(1),(3)(b): The AZA Lion Care Manual states that lions should be provided access to minimum-sized indoor enclosures or a supplemental heat source in temperatures below 50 °F. Failure to provide adequate indoor enclosures or supplemental heat sources for lions in Greenville, Wisconsin—which regularly has daily high temperatures below freezing during winter months—constitutes failure to provide necessary

Case 1:20-cv-00216-WCG   Filed 02/12/20   Page 27 of 37   Document 1

shelter in contravention of the criminal code. Likewise, the raccoon cage does not provide sufficient roofing to protect the animals from the elements, and the wolf enclosures are frequently muddy when it rains, demonstrating that they do not provide adequate protection from "inclement weather" or "shelter appropriate to the local climatic conditions."

100. Wis. Admin. Code § NR 16.30(4)(c): This provision specifically requires raccoon pens to be "designed and constructed of suitable materials" and "kept in good repair." The Zoo's cage with a wire floor does not meet these standards. The raccoon cage also fails to protect the animals from the elements and egregiously violates sanitation conditions, as discussed above.

101. Wis. Stat. § 951.02: There are numerous reports of Special Memories Zoo failing to provide sick animals with appropriate—or even adequate—veterinary care, leading to severe injury and even death. According to complaints, these harmed animals include but are not limited to a kangaroo, 6–8 badgers, a macaque, a skunk, a spider monkey, two goats—including one baby—a cotamundi, and two lions. Ms. Crowe, the Zoo Manager, has likely covered up at least one of these incidences. These incidences demonstrate the direct harm Special Memories Zoo causes to animals.

102. Wis. Admin. Code. § NR 16.30(4)(c)2.d: This provision specifically requires otter enclosures to have 50 gallon pools, which the Zoo does not regularly provide. Indeed, former employees indicated that the water receptacle and pool for the otters is rarely cleaned or replaced with fresh water and is often covered in algae. The pool is drained during the winter months and the only other water source provided to the otters while their pool is drained is a bucket of drinking water. Otters are semi-aquatic animals whose natural behavior and movements cannot be satisfied in a small bucket.

103.     Special Memories Zoo is additionally liable for violating local ordinances. Greenville, where the Zoo is located, and Hortonville, where the Wheelers and Ms. Crowe keep animals on the "Farm," employ the same public-nuisance definition. The treatment of animals at the Zoo and Farm "[g]reatly offend[s] . . . public morals [and] decency" and therefore constitutes a public nuisance. Hortonville Ord. § 10.02; Greenville Ord. § 198-2. In addition, both town ordinances detail specific conditions that constitute public nuisances. The Farm in Hortonville violates the town's ordinance because it is a "breeding place[] for insects and vermin" and emits "noxious odors." The Zoo in Greenville is a "breeding place for vermin, insects, etc.," emits "noxious odors," and creates "unhealthy or unsanitary conditions." Moreover, Greenville's ordinances require all owners and caretakers of an animal to "provide it with adequate food, adequate water and adequate heating, cooling, ventilation, sanitation, shelter, and medical care consistent with the normal requirements of an animal's size, species and breed." Greenville Ord. § 76-14.

104.     Wisconsin State Law aims to promote and extend the protections of the federal ESA. Wis. Stat. § 29.604(1); *Barnes v. Dep't of Nat. Res*., 516 N.W.2d 730, 735 (1994) ("From the statute's statement of purpose . . . it is clear that the legislature intended this statute to complement the federal Endangered Species Act by strengthening the potential for the continued existence of endangered and threatened species within this state."). Wisconsin's endangered species list "consist[s] of three parts: wild animals and wild plants on the U.S. list of endangered and threatened foreign species; wild animals and wild plants on the U.S. list of endangered and threatened native species; and a list of endangered and threatened Wisconsin

species." Wis. Stat. § 29.604(3).[3] The statute prohibits any person from taking, transporting, possessing, processing or selling "any wild animal *specified by the department's endangered and threatened species list*" within the state. Wis. Stat. § 29.604(4). Because the department's list consists of federally endangered and threatened species, Special Memories Zoo's violations of the ESA are also violations of Wisconsin's endangered species protections.

105.     Upon information and belief, and based on the overall conditions at the Zoo, its evident inability to properly care for animals, and its violations of local, state, and federal laws, each of these animals (and any other similarly confined animal whose presence at the Zoo is revealed through discovery) is suffering and is likely to continue suffering if not remedied promptly. The conditions imposed on these animals by the Zoo violate the state regulations and statutes described above and constitute a public nuisance.

## ALDF's Article III Associational Standing

106.     As set forth above, ALDF brings this lawsuit to vindicate its own interests and the interests of its members, including the member whose visit to the Zoo is referenced in this Complaint.

107.     ALDF's stated organizational mission is "to advance the interests and protect the lives of animals through the legal system." One of ALDF's cornerstone issues is protecting members of threatened and endangered species from illegally inadequate housing, treatment, and conditions at commercial facilities such as unaccredited and inadequate zoos like Special Memories Zoo. Using the ESA, ALDF regularly engages in significant advocacy and public

---

[3] To the extent that the FWS's split-listings do not apply under Wisconsin state law, Wisconsin's protections will extend to even more captive species, like the Canada lynx and Japanese macaque, than the ESA's.

education efforts to raise awareness about the conditions in which threatened and endangered species are held in captivity and to improve their physical and mental well-being.

108.     ALDF's members suffered and are suffering legally cognizable injuries as a result of observing with their own eyes the inadequate conditions in which the animals at the Zoo are kept. This includes many of the specific circumstances alleged above where animals were visibly suffering, including attempts by a thirsty giraffe to drink from one member's water bottle.

109.     Specifically, the ALDF member who visited the Zoo was prevented from viewing and enjoying the animals kept there in appropriate conditions because the inadequate conditions described above persist.

110.     ALDF's affected member who visited the Zoo fully intends to return to view the animals she met once conditions improve, but she is unable to do so because she experienced significant distress as a result of viewing the animals in current conditions, and those conditions continue to persist.

## COUNT I - UNLAWFUL "TAKE" OF ENDANGERED SPECIES UNDER THE ENDANGERED SPECIES ACT

111.     Each and every allegation set forth above is incorporated herein by reference.

112.     ALDF has Article III standing to assert this claim on behalf of itself and its member who personally visited the Zoo and suffered a cognizable injury as a result of observing the animals held in inadequate conditions with their own eyes.

113.     Congress passed the ESA in recognition that species in danger of, or threatened with, extinction "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," and that the United States pledged to the international community "to conserve to the extent practicable various species of fish or wildlife and plants facing extinction." 16 U.S.C. § 1531(a)(3)-(4).

114.    The ESA defines an "endangered species" as "any species which is in danger of extinction." *Id.* § 1532(6).

115.    The Act requires the Secretary of Interior to identify which species are endangered or threatened and list them accordingly. *Id.* § 1533. The Secretary fulfills this obligation through the FWS.

116.    Section 9 of the ESA prohibits the "take" of endangered species. *Id.* § 1538(a)(1). Pursuant to its statutory authority to "by regulation prohibit with respect to any threatened species any act prohibited under [Section 9(a)(1)], in the case of fish or wildlife," the Department of Interior has generally extended the take prohibition to species listed as threatened. 50 C.F.R. § 17.31.

117.    The prohibitions of the ESA apply to endangered or threatened animals bred or kept in captivity as well as those in the wild. *See, e.g.*, 80 Fed. Reg. 7380, 7399 (Feb. 10, 2015) ("On its face the ESA does not treat captives differently. . . Section 9[] of the ESA [prohibiting take] applies to endangered species regardless of their captive status."); 50 C.F.R. § 17.3 (defining the "take" definition's term "harass" in the context of captive animals).

118.    The ESA defines "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Congress intended for "take" to "be defined in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 307, 93d Cong., 1st Sess. (1973), reprinted in 1973 U.S.C.C.A.N. 2989, 2995.

119.    The Department of Interior defined the term "harass" to mean "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to

such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. It defined the term "harm" to mean "an act which actually kills or injures wildlife." *Id*.

120.     Section 9 of the ESA makes it unlawful to "possess, sell, deliver, carry, transport, or ship" any endangered or threatened species that was unlawfully taken in violation of Section 9. 16 U.S.C. § 1538(a)(1)(D). In addition, Section 9 makes it unlawful to "deliver, receive, carry, transport, or ship in interstate or foreign commerce . . . in the course of commercial activity" any endangered or threatened species, regardless of whether the species was taken. *Id*. § 1538(a)(1)(E).

121.     As detailed above, the Zoo violated and continues to violate the ESA and its implementing regulations by, at least, "taking" endangered ring-tailed lemurs, red-ruffed lemurs, gray wolves, tigers, lions, and a black leopard within the meaning of 16 U.S.C. § 1538(a)(1)(B), without a permit, at the Zoo. Additionally, because the split-listing for captive born Canada lynx and Japanese or snow macaques is invalid, the Zoo also violated and continues to violate the ESA and its implementing regulations by "taking" those threatened species without a permit.

122.     This Court has the authority to issue an injunction prohibiting the Zoo from committing further violations of the ESA and to compel the Zoo to remedy current violations of the ESA. 16 U.S.C. § 1540(g)(1)(a). Moreover, this Court has the authority to award the costs of litigation, including reasonable attorney and expert witness fees, to any party whenever the Court determines such award is appropriate. 16 U.S.C. § 1540(g)(4).

## COUNT II - UNLAWFUL POSSESSION OF PROTECTED SPECIES UNDER THE ENDANGERED SPECIES ACT

123.     Each and every allegation set forth above is incorporated herein by reference.

124.     The ESA, 16 U.S.C. § 1538(a)(1)(D), prohibits the possession, by any means whatsoever, of any species taken in violation of § 1538(a)(1)(B) and (C).

125.     As detailed above, the Zoo violated and continues to violate the ESA and its implementing regulations by possessing and continuing to possess unlawfully taken species, including endangered ring-tailed lemurs, red-ruffed lemurs, gray wolves, tigers, lions, and a black leopard, as well as threatened Canada lynx and Japanese or snow macaques, within the meaning of 16 U.S.C. § 1538(a)(1)(D).

126.     This Court has the authority to issue an injunction prohibiting the Zoo from committing further violations of the ESA and to compel the Zoo to remedy current violations of the ESA. 16 U.S.C. § 1540(g)(1)(a). Moreover, this Court has the authority to award the costs of litigation, including reasonable attorney and expert witness fees, to any party whenever the Court determines such award is appropriate. 16 U.S.C. § 1540(g)(4).

### COUNT III - PUBLIC NUISANCE

127.     Each and every allegation set forth above is incorporated herein by reference.

128.     In Wisconsin, "[a]ny person, county, city, village or town may maintain an action to recover damages or to abate a public nuisance from which injuries peculiar to the complainant are suffered, so far as necessary to protect the complainant's rights and to obtain an injunction to prevent the same." Wis. Stat. Ann. § 823.01. "A public nuisance is a condition or activity which substantially or unduly interferes with the use of a public place or with the activities of an entire community." *Physicians Plus Ins. Corp. v. Midwest Mut. Ins. Co.*, 646 N.W.2d 777, 788 (Wis. 2002). Violation of a statute or even an ordinance is not necessary, but can be sufficient, to establish a public nuisance under Wisconsin Supreme Court precedent. *See State v. H. Samuels Co.*, 211 N.W.2d 417, 420–21 (1973).

129.     As described above, Special Memories Zoo is violating Wisconsin animal cruelty statutes, captive wildlife regulations, Wisconsin's Endangered Species Act, and Greenville and Hortonville local ordinances.

130.     Because of the ongoing harm caused to the animals and the risk that their improper captivity by the Zoo poses to public safety, the Zoo's unsafe confinement of its animals is an actionable public nuisance.

131.     ALDF members have been injured by the Zoo's nuisance above and beyond the injury suffered by the public generally because they experienced significant distress as a result of visiting the Zoo for recreational purposes and to view the animals. Specifically, the ALDF member referenced above became distressed and upset due to the animal mistreatment and suffering that she witnessed. ALDF members' interests in observing and otherwise enjoying animals at the Zoo were and will continue to be harmed by the Zoo's mistreatment of animals through its operation and management of the Zoo.

132.     The relief sought in this lawsuit—including, but not limited to, the transfer of animals to a bona fide sanctuary—will redress ALDF and its members' ongoing harms from the Zoo's activities at the Zoo. Specifically, the ALDF member would return to the Zoo if the treatment and conditions substantially improve to be in compliance with law, or would otherwise visit the animals if they are moved to a bona fide sanctuary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ALDF respectfully prays for the following relief:

A.     Declare that Special Memories Zoo is violating the ESA by illegally taking endangered ring-tailed lemurs, red-ruffed lemurs, gray wolves, tigers, lions, and a black leopard without a permit;

B.  Declare that Special Memories Zoo is violating the ESA by illegally taking threatened Canada lynx and Japanese or snow macaques without a permit;

C.  Declare that Special Memories Zoo is violating the ESA by possessing and continuing to possess individuals of endangered and threatened species that were illegally "taken";

D.  Enjoin Special Memories Zoo from engaging in operations and activities that cause the "take" of the endangered ring-tailed lemurs, red-ruffed lemurs, gray wolves, tigers, lions, and black leopard, as well as threatened Canada lynx and Japanese or snow macaques;

E.  Enjoin Special Memories Zoo from possessing or acquiring endangered and threatened species that were illegally taken;

F.  Enjoin Special Memories Zoo from maintaining a public nuisance, namely by confining endangered, threatened, and non-endangered animals in inhumane and unsafe conditions;

G.  Enter a permanent injunction against Special Memories Zoo that terminates all Special Memories Zoo ownership and possessory rights in its animals;

H.  Appoint a special master or guardian ad litem to identify reputable wildlife sanctuaries and to determine the most appropriate placement for the forfeited animals, consistent with the animals' best interests;

I.  Charge the cost of transferring and rehoming the forfeited animals to Special Memories Zoo;

J.  Enter a permanent injunction against Special Memories Zoo prohibiting Special Memories Zoo from obtaining other animals;

K.  Award ALDF its reasonable attorneys' fees and litigation costs in this action; and

L.      Grant ALDF such other and further relief the Court may deem just and proper.


Dated: February 12, 2020.                    Respectfully submitted,


                                    /s/     Laura M. Konkel
                                    Laura M. Konkel, SBN 1078880
                                    MICHAEL BEST & FRIEDRICH LLP
                                    One South Pinckney Street, Suite 700
                                    Madison, Wisconsin 53703
                                    Phone:  608.257.3501
                                    Fax:  608.283.2275
                                    Email: lmkonkel@michaelbest.com


                                    Melanie J. Reichenberger, SBN 1061510
                                    MICHAEL BEST & FRIEDRICH LLP
                                    100 E. Wisconsin Avenue, Suite 3300
                                    Milwaukee, Wisconsin 53202
                                    Phone:  414.271.6560
                                    Fax:  414.277.0656
                                    Email: mjreichenberger@michaelbest.com


                                    Anthony T. Eliseuson
                                    ANIMAL LEGAL DEFENSE FUND
                                    150 South Wacker Drive, Suite 2400
                                    Chicago, IL 60606
                                    Telephone: 707.795.2533, Ext. 1043
                                    Facsimile: 707.795.7280
                                    Email: aeliseuson@aldf.org


                                    Daniel H. Waltz
                                    ANIMAL LEGAL DEFENSE FUND
                                    The Yard, 700 Wisconsin Ave SE
                                    Washington, DC 20003
                                    Telephone: 707.795.2533, Ext. 1066
                                    Facsimile: 707.795.7280
                                    Email: dwaltz@aldf.org


                                    *Attorneys for Plaintiff*
                                    *Animal Legal Defense Fund*